UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OSSIE GILES,

          Plaintiff,

    v.

D. REYES, et al.,

          Defendants.

Case No. 15-cv-04838-YGR (PR)

**ORDER DENYING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION; AND GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

## I. BACKGROUND

Plaintiff Ossie Giles, a state prisoner currently incarcerated at San Quentin State Prison ("SQSP"), has filed a *pro se* civil rights complaint under 42 U.S.C. § 1983. Plaintiff, who claimed he suffered from severe back pain, alleged that Defendants from California State Prison - Solano ("CSP-Solano") failed to give him treatment for his back pain while he was housed there from 2006 until the date he was transferred to SQSP on December 8, 2009. Dkt. 1 at 3-4.[1] Plaintiff also alleged that Defendants at SQSP continued to deny him treatment for his back pain after he was transferred there. *Id.* at 4-7. Plaintiff claimed that in April of 2014 he could no longer walk, and he had to undergo emergency back surgery on May 20, 2014. *Id.* at 8-9. Plaintiff named the following Defendants at SQSP: Doctors D. Reyes and J. Espinoza; and Chief Medical Officer ("CMO") E. Tootell. He also named the following Defendants at CSP-Solano: Doctors B. Naki, T. Tran and Yuen Chen. Plaintiff seeks monetary damages.

In an Order dated March 28, 2016, the Court summarized the facts relating to the constitutional violations alleged by Plaintiff and found that he stated a cognizable claim, as follows:

> Plaintiff alleges that he suffers from serious medical needs, specifically his severe back pain. Dkt. 1 at 3-8. Plaintiff claims that Defendants Reyes, Espinoza and Tootell were deliberately indifferent to his serious medical needs for failing to provide him treatment for his back pain from the time he was transferred to

---

[1] Page number citations refer to those assigned by the Court's electronic case management filing system and not those assigned by the parties.

> SQSP on December 8, 2009 until he had to receive emergency back surgery on May 20, 2014. *Id.* at 5-8. Liberally construed, Plaintiff's allegations relating to the aforementioned actions state a cognizable claim for deliberate indifference to his serious medical needs against Defendants Reyes, Espinoza and Tootell.

Dkt. 8 at 3. The Court ordered service of the complaint on Defendants Reyes, Espinoza and Tootell. Plaintiff's claims relating to all problems during his incarceration at CSP-Solano against Defendants Naki, Tran and Chen were dismissed without prejudice to Plaintiff refiling them in a new civil rights action in the United States District Court for the Eastern District of California.

The remaining parties from SQSP—Defendants Reyes, Espinoza and Tootell (hereinafter "Defendants")— are presently before the Court on their Motion for Summary Judgment on the grounds that Defendants Reyes's and Espinoza's treatment of Plaintiff's back pain: (1) did not amount to deliberate indifference of his serious medical needs; and (2) was within the standard of medical care. Dkt. 30 at 2. Defendants also claim that "[a]t no time relevant to plaintiff's lawsuit did [Defendant] Tootell in any way diagnos[e] or treat plaintiff." *Id.* at 11. Thus, Defendants argue that Plaintiff has not made a causal link between Defendant Tootell and the violation of his constitutional rights. *Id.* Plaintiff has filed an opposition to Defendants' motion, and Defendants have filed a reply. Dkts. 33, 34.

Plaintiff has also filed a motion for a preliminary injunction, to which Defendants have filed a response. Dkts. 28, 35.

For the reasons stated below, Plaintiff's motion for a preliminary injunction is DENIED, and Defendants' motion for summary judgment is GRANTED.

## II. PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

Plaintiff has filed a request for a preliminary injunction concerning medical treatment needed to "alleviate [his] daily pain and suffering." Dkt. 28 at 1. Specifically, Plaintiff seeks an injunction requiring Defendants to move forward with further diagnostic testing that was originally suggested during a consultation with a "neuro specialist" (i.e., neurosurgery consultant) from University of California-San Francisco ("UCSF") named Dr. Wadhwa (a non-party) on October 29, 2015. *See id.* Defendants have filed an opposition to his motion. Dkt. 35.

### A. Standard of Review

The PLRA restricts the power of the district court to grant prospective relief in any action involving prison conditions. *See* 18 U.S.C. § 3626(a); *Oluwa v. Gomez*, 133 F.3d 1237, 1239 (9th Cir. 1998). Section 3626(a)(2) applies specifically to preliminary injunctive relief. *See* 18 U.S.C. § 3626(a)(2). In civil actions with respect to prison conditions it permits the court to enter a temporary restraining order ("TRO") or preliminary injunction "to the extent otherwise authorized by law" but also requires that such an order "must be narrowly drawn, extend no further than necessary to correct the harm the court finds requires preliminary relief, and be the least intrusive means necessary to correct that harm." *Id.*

Federal Rule of Civil Procedure 65 sets forth the procedure for issuance of a preliminary injunction or TRO. The standard for issuing a TRO is similar to that required for a preliminary injunction. *See L.A. Unified Sch. Dist. v. United States Dist. Court*, 650 F.2d 1004, 1008 (9th Cir. 1981) (Ferguson, J., dissenting). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008). This standard replaces the previous tests for preliminary injunctions that had been used in the Ninth Circuit. *Am. Trucking Associations, Inc. v. Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009).

### B. Defendants' Arguments

In conjunction with their opposition to the request for a preliminary injunction, Defendants rely on the declaration Defendant Espinoza that had been filed in support of their motion for summary judgment. In reliance upon this document, Defendants argue that Plaintiff does not meet the standard for preliminary injunctive relief.

#### 1. Standard of Review

First, Plaintiff must established probable success on the merits with respect to his claim of deliberate indifference to his serious medical needs. Specifically, he must establish that Defendants have acted with a sufficiently culpable state of mind, that is, knowingly disregarding an excessive risk to inmate health. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994). In support

3

of their argument that Plaintiff has not met his burden, Defendants rely upon Plaintiff's medical records, which reveal as follows:

> . . . after Dr. Wadhaw's consultation and nine months of chronic care follow up, it because clear that the right leg pain and symptoms, which prompted plaintiff's referral to Dr. Wadhwa, were in fact due to plaintiff's chronic ulcers and not his spine.  Accordingly, the diagnostic tests suggested by Dr. Wadhwa were not ordered.

Dkt. 35 at 1.  As such, it seems that Defendants are arguing that Plaintiff will not likely be successful on the merits of his deliberate indifference to medical care lawsuit.

### 2. Irreparable Injury

Defendants also seem to maintain that Plaintiff cannot show irreparable injury justifying the relief sought in the form of ordering medical staff to perform the diagnostic tests suggested by Dr. Wadhwa.  Dkt. 35 at 1-4.  In their opposition to the request for a preliminary injunction, Defendants show that Plaintiff's medical evidence indicated that he received appropriate pain management and medical care during the time he received follow-up care from prison medical staff after his October 29, 2015 consultation with Dr. Wadhwa, who suggested "a new MRI[2] of the lumbar spine, CT[3] of the lumbar spine and dynamic lumbar x-rays."  *Id.* (citing Espinoza Decl. ¶ 27, Ex. A).  Defendants then list an explanation of Plaintiff's follow up care, which has been summarized by the Court as follows:

> November 5, 2015, – Chronic care follow up with Defendant Espinoza, who suggested for Plaintiff to be classified as a Disability Impaired Level Terrain ("DLT") and transferred to a level terrain facility.  While Plaintiff was initially resistant to such a suggestion, he agreed and was "designated as ADA[4] code DLT."  Plaintiff would be transferred to another institution immediately, and therefore Defendant Espinoza discussed with Plaintiff that he would be given a follow-up appointment with a new neurosurgeon at his

---

[2] Magnetic resonance imaging ("MRI") is a medical imaging technique used in radiology to form pictures of the anatomy and the physiological processes of the body in both health and disease.  *See* https://en.wikipedia.org/wiki/Magnetic_resonance_imaging (last accessed Aug. 3, 2017).

[3] A CT or computed tomography scan makes use of computer-processed combinations of many x-ray measurements taken from different angles to produce cross-sectional images (i.e., virtual "slices") of specific areas of a scanned object, allowing the user to see inside the object without cutting.  *See* https://en.wikipedia.org/wiki/CT_scan (last accessed July 30, 2017).

[4] ADA means the Americans with Disabilities Act of 1990.

new facility.  Espinoza Decl. ¶ 28.

January 12, 2016 – Plaintiff submitted a Health Care Service Request Form inquiring why his MRI, CT scan and dynamic lumbar x-rays had not yet been ordered as suggested by Dr. Wadhwa.  *Id.* ¶ 32.

January 14, 2016 – Chronic care follow up with Defendant Espinoza regarding skin lesions that had appeared three weeks ago.  A biopsy was performed and Plaintiff was given prednisone.  When Plaintiff inquired about his MRI, CR scan and dynamic lumbar x-rays, Defendant Espinoza explained that Plaintiff would soon be leaving SQSP for a level terrain facility where he would defer to the new neurosurgeon if any further imaging was indicated.  Defendant Espinoza also noted that Plaintiff had a recent MRI on August 11, 2015,.  Plaintiff was on a medical hold due to his dermatology issue, and he indicated he preferred to stay at SQSP until his lesions were resolved.  *Id.* ¶ 13.

January 28, 2016 – Another chronic care follow up with Defendant Espinoza regarding skin lesions.  Plaintiff stated that the lesions were getting better and he was not in pain today.  Defendant Espinoza discussed Plaintiff's neurosurgery follow up, which was pending until his transfer.  Plaintiff requested to keep his medical hold until his lesions had significantly resolved, and said that it was alright holding off on his neurosurgery follow up.  He claimed that his pain had decreased and mobility issues had improved in the last four to five weeks.  Plaintiff was then referred to see a local dermatologist.  *Id.* ¶ 34.

May 2, 2016 – Plaintiff refused to be seen by Defendant Espinoza for another chronic care follow up.  *Id.* ¶ 35.

May 3, 2016 – Defendant Espinoza discussed Plaintiff's lesions with Dr. Mohebali at Kentfield Wound Care, and they decided to start Plaintiff on antibiotics.  Defendant Espinoza made arrangements for Plaintiff to be seen in the clinic to discuss the plan with him and to order the recommended antibiotics.  Plaintiff initially refused to be seen, but later agreed to speak with Defendant Espinoza but explained that he was upset because he was not given narcotics for his right leg ulcers.  *Id.* ¶ 36.

July 5, 2016 – Plaintiff was examined at Kentfield Wound Care and UCSF dermatology, where he was receiving treatment for his chronic leg ulcers (which have slowly improved).  Plaintiff reported that his back pain and related symptoms have continued to improve significantly and that he was walking the lower yard without any issue.  Plaintiff refused to be seen by Defendant Espinoza, who continued to communicate with the specialists and coordinated Plaintiff's treatment with Kentfield Wound Care and UCSF.  Defendant Espinoza claims that "[i]t became clear that the right leg pain and symptoms which prompted [Plaintiff's] referral to the second neurosurgeon, Dr. Wadhwa, were in fact due to his skin condition (his lesion[s] showed up shortly thereafter)  and not his spine." *Id.* ¶ 37.

5

*Id.* (footnotes added). Based on the above findings, the diagnostics tests suggested by Dr. Wadhwa were not ordered. *Id.* at 4.

### 3. Conclusion

Based on the supporting evidence set forth by Defendants, the Court finds that Plaintiff does not meet the requirements for preliminary injunctive relief pending disposition of his claims. Moreover, based on the record at this point, the Court cannot say that he has shown probable success with respect to his remaining allegations of deliberate indifference. Accordingly, the request for a preliminary injunction is DENIED. Dkt. 28.

## III. DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### A. Factual Background[5]

#### 1. The Parties

At the time of the events set forth in his complaint, Plaintiff was a state prisoner who was incarcerated at SQSP. *See* Dkt. 1 at 1; Dkt. 38-1 at 1. Also during the time frame at issue, Defendants Reyes and Espinoza were Primary Care Physicians ("PCPs") at SQSP. Reyes Decl. ¶ 1; Espinoza Decl. ¶ 1. Finally, as mentioned above, Defendant Tootell was the CMO at SQSP. Dkt 1 at 2.

#### 2. Plaintiff's Version

Plaintiff claims that he was transferred to SQSP on December 8, 2009. Dkt. 1 at 4. He mentioned his back issues at his health assessment upon his arrival at SQSP. *Id.*

Plaintiff claims that at his initial consultation with Defendant Reyes, he requested a lower bunk due to his back pain. *Id.* at 5. Plaintiff claims that Defendant Reyes told Plaintiff that he

---

[5] This Order contains many acronyms. Here, in one place, they are:

| | |
|---|---|
| ADA | Americans with Disabilities Act of 1990 |
| CDCR | California Department of Corrections and Rehabilitation |
| CMO | Chief Medical Officer |
| DLT | Disability-Impaired Level Terrain |
| OHU | Outpatient Housing Unit (Equivalent to an Infirmary) |
| PCP | Primary Care Physician |
| SQSP | San Quentin State Prison |
| TTA | Treatment and Triage Area (Equivalent to Emergency Room) |
| UCSF | University of California-San Francisco |

United States District Court
Northern District of California

"needed to do core strengthening for [his] back pain." *Id.* Plaintiff claims he explained that he had previously had an MRI, which "showed [his] L-4 and L-5 [were] messed up." *Id.* Plaintiff claims that his medical records arrived at SQSP four months after his transfer, and they "showed [his] back issues like [he] had been saying all alon[g], yet [Defendant Reyes] did nothing to accommodate [him] . . . ." *Id.* at 6. Plaintiff claims that his "condition exacerbated because of [Defendant Reyes's] negligen[ce]." *Id.*

Plaintiff claims that he "started seeing [Defendant] Espinoza and other doctor[s] in 2014." *Id.* at 7. He states that "the medical care they provided [for his] back issues amounted to no medical care at all." *Id.* at 7. Plaintiff claims that he was admitted to the Outpatient Housing Unit (CDCR's equivalent to an infirmary)[6] on April 17, 2014[7] because he could no longer walk and required a wheelchair to move around. *Id.* at 7-8, 23. However, Plaintiff claims that Defendant Espinoza should have made the decision to have Plaintiff admitted at the Outpatient Housing Unit ("OHU") on an *earlier* date. *Id.* at 8. Plaintiff claims that he was admitted at the OHU from April 17, 2014 until July 16, 2014, and that he needed a wheelchair because he could not walk. *Id.*

On May 20, 2014, Plaintiff claims that he underwent "urgent emergency back surgery" by Dr. T. Mampalan (a non-party). *Id.* However, Plaintiff claims that he initially "thought [he] was getting better but [he went] through the same issues with medical as [he] did prior to [his] back surgery." *Id.* at 8-9. Plaintiff claims that Defendant Espinoza "assured [him] that if [his] MRI showed a negative finding she'd refer [him] to a different neurosurgeon for [a] second opinion." *Id.* at 9. However, Plaintiff claims that "every time [he] ask[s] about that or any other accommodation [Defendant Espinoza] interjects the threat[] of transfer." *Id.*

Finally, Plaintiff points out that Defendant Tootell is the CMO at SQSP, but she "does

---

[6] The OHU is a medical unit that is walker-and-wheelchair-accessible and where inmates are housed temporarily after returning from hospital stays or because they have other medical or disability needs.

[7] The Court notes that in his complaint, Plaintiff stated he was housed at the OHU from "4-17-20*15*, until 7-16-2014." Dkt. 1 at 8 (emphasis added). However, the record shows that this is a typographical error, and that Plaintiff was first housed at the OHU on April 17, 20*14*. *Id.* at 23; Espinoza Decl. ¶ 11.

nothing to assert her authority to approve or arrange any accommodations in a timely fashion." *Id.* at 10.

### 3. Defendants' Version

#### a. Treatment By Defendant Reyes

On March 3, 2010, Defendant Reyes examined Plaintiff for the first time after his December 8, 2009 transfer from CSP-Solano. Reyes Decl. ¶ 4. Plaintiff's main complaint was low back pain, which persisted for over four years. *Id.* Plaintiff claims he could do his daily activities without problems and had "good overall function." *Id.* Plaintiff walked with a normal steady gait and was able to get up from sitting without difficulty. *Id.* Plaintiff was noted to be stable with no neurological deficits. *Id.* There was no need to prescribe narcotics. *Id.*

On June 3, 2010, Defendant Reyes examined Plaintiff for complaints of a cough and lateral thigh pain. Reyes Decl. ¶ 5. Unlike his previous March 3, 2010 visit, Plaintiff did not complain of low back pain. *Id.* Plaintiff walked with a normal steady gait, did not require any assistive device and ambulated on and off the exam table with agility. *Id.* Defendant Reyes continued Plaintiff's Tylenol prescription and encouraged him to lose weight. *Id.*

On July 8, 2010, Plaintiff was examined for a follow up of his previous complaint of chronic intermittent low back pain, but he made no current complaints of low back pain. Reyes Decl. ¶ 6. He was "neurovascularly intact and without weakness." *Id.* An MRI from April 2008 noted some degenerative disc disease. *Id.*

On November 18, 2010, Defendant Reyes examined Plaintiff for a routine follow up. Reyes Decl. ¶ 7. Plaintiff had made a previous complaint of left wrist pain, but the x-ray result was negative. *Id.* He had no complaint of low back pain at this visit. *Id.*

On February 4, 2011, Defendant Reyes examined Plaintiff for a routine follow up relating to his complaint of left wrist pain. Reyes Decl. ¶ 8. Defendant Reyes suggested a steroid injection, but Plaintiff was reluctant to follow such a suggestion. *Id.* Plaintiff made no complaints about low back pain. *Id.*

On March 24, 2011, Defendant Reyes examined Plaintiff for a routine follow up. Reyes Decl. ¶ 9. He claimed that his wrist pain was "much improved" and that he had not made any low

back pain complaints recently. *Id.* Defendant Reyes once again encouraged Plaintiff to lose weight. *Id.*

On June 24, 2011, Plaintiff was examined by Defendant Reyes for another routine follow up, and he made no complaints of low back pain at this visit. Reyes Decl. ¶ 10. Defendant Reyes encouraged Plaintiff to go to the yard and walk some laps. *Id.*

On August 25, 2011, Plaintiff was examined for his complaints of chronic wrist pain, but, again, he refused to have a steroid injection administered. Reyes Decl. ¶ 11. Defendant Reyes noted that Plaintiff had been complaining about his wrist pain—without diagnosis—for about one year. *Id.* Plaintiff made no complaints of low back pain. *Id.*

On October 6, 2011, Plaintiff was examined for yet another routine follow up for his left wrist pain. Reyes Decl. ¶ 12. Plaintiff did not make any mention of back pain, and he stated that he could climb up four flights of stairs. *Id.*

On January 5, 2012, Plaintiff was examined for a routine follow up visit. Reyes Decl. ¶ 13. Plaintiff claimed that his main complaint was chronic wrist pain, but that "overall he was doing fine." *Id.* Plaintiff made no other complaints. *Id.*

### b. Treatment By Defendant Espinoza and Non-Party Medical Providers

#### 1) Low Back Pain

On February 24, 2014, Plaintiff was examined by Defendant Espinoza for "back pain exacerbation." Reyes Decl. ¶ 14; Espinoza Decl. ¶ 4. Plaintiff stated the pain radiated down his left buttock into his leg. Espinoza Decl. ¶ 4. He claimed that he did not feel any numbness or weakness, but the pain worsened when he was walking. *Id.* Plaintiff stated he has had low back pain for five years but the "sciatica pain" started about two months ago. *Id.* Plaintiff had "good functional status" and was able to exercise. *Id.* Defendant Espinoza ordered lumbar x-rays, prescribed ibuprofen, and scheduled a "close" follow-up visit. *Id.*

On February 28, 2014, Plaintiff was notified that his x-ray results showed "severe degenerative changes at L5-S1.[8]" Espinoza Decl. ¶ 5 (footnote added). There were moderate

---

[8] The L5-S1 vertebrae forms a junction known as the lumbosacral joint, which is a joint of the body, between the last lumbar vertebra (L5) and the first sacral segment of the vertebral

degenerative changes in the remainder of the lumbar spine.  *Id.*  However, no acute fracture or subluxation[9] were seen.  *Id.* (footnote added).

On March 17, 2014, Plaintiff was examined for a routine follow up visit for his back pain complaints.  Espinoza Decl. ¶ 6.  Plaintiff said that his pain had worsened, and that Tylenol and ibuprofen were not helping to alleviate the pain.  *Id.*  Plaintiff complained that the pain radiated down his left buttock, but denied left-side numbness.  His neurological exam showed "5/5 strength in both extremities but he did require some coaching on the left side secondary to pain."  *Id.*  Plaintiff was prescribed neuropathic pain medication called Nortriptyline.[10]  *Id.* (footnote added).  Defendant Espinoza explained to Plaintiff that he would have to take the neuropathic pain medications for a few weeks before he would see any improvement.  *Id.*  However, if his symptoms did not improve after a few weeks, then Defendant Espinoza planned to order an MRI at Plaintiff's next visit.  *Id.*  Additionally, Plaintiff was referred to physical therapy, and Defendant Espinoza requested for Plaintiff's appointment to be expedited.  *Id.*  Defendant Espinoza offered Plaintiff a lower bunk accommodation.  *Id.*  Plaintiff declined because he had a good cell mate and did not want to change housing.  *Id.*  Defendant Espinoza also made arrangements for an inmate worker to temporarily bring Plaintiff his meal trays because he said it was painful to walk to the dining hall.  *Id.*

On April 1, 2014, Plaintiff was examined by Dr. Alvarez (a non-party) in the Treatment and Triage Area ("TTA") (CDCR's equivalent to an Emergency Room) for back pain.  Espinoza Decl. ¶ 7.  Plaintiff related that his back pain, which persisted for the last several days, had radiated to his bilateral posterior upper thighs.  *Id.*  No evidence of atrophy in his legs existed.  *Id.*  His reflexes and sensation were normal and he had good strength.  *Id.*  He was able to ambulate.  *Id.*  Plaintiff was given a Toradol injection that relieved his pain.  *Id.*  Plaintiff was advised to

column (S1).  *See* https://en.wikipedia.org/wiki/Lumbosacral_joint (last accessed Jun. 2, 2016).

[9] A subluxation is an incomplete or partial dislocation of a joint or organ.  *See* https://en.wikipedia.org/wiki/Subluxation (last accessed Jun. 23, 2017).

[10] Nortriptyline is a tricyclic antidepressant (TCA) used to treat clinical depression.  Off-label uses include chronic pain and migraine and labile affect in some neurological disorders.  *See* https://en.wikipedia.org/wiki/Nortriptyline (last accessed Aug. 15, 2017).

return if new symptoms developed and to discuss his back pain symptoms with his PCP. *Id.*

On April 1, 2014, Plaintiff had an appointment for a physical therapy consultation. *Id.* Espinoza Decl. ¶ 8. Plaintiff stated that he awoke about one month ago with severe sciatic pain extending to his left ankle. *Id.* He claimed he had never experienced such pain previously. *Id.* Plaintiff was instructed to perform certain exercises. *Id.*

On April 10, 2014, Plaintiff was examined during a follow-up visit for his back pain. *Id.* Espinoza Decl. ¶ 9. Plaintiff reported that he experienced no improvement and was having more pain especially with ambulation. *Id.* Plaintiff had difficulty cooperating with the exam because of pain, but he had "good strength." *Id.* He was able to walk with a cane, but experienced significant pain and had a limp. *Id.* An urgent MRI was ordered to be done on April 16, 2014 due to severe lumbar pain progressing in a short period of time. *Id.* His neuropathic pain medication was changed (because he was having side effects to the initial agent), and he was prescribed a muscle relaxant and Naproxen.[11] *Id.* (footnote added). Defendant Espinoza offered to move Plaintiff to the OHU, where he might be more comfortable and not have to walk around to appointments and other activities. *Id.* Plaintiff declined the offer because he reported that the situation was manageable in his housing unit, and he did not want to move to the OHU. *Id.* Defendant Espinoza and Plaintiff ultimately agreed that this offer would be reevaluated in one week after Plaintiff tried the new medications, but that there was "a very low threshold to admit him to the OHU at that point." *Id.*

On April 15, 2014, Plaintiff refused further physical therapy (despite being offered a wheelchair for transport). Espinoza Decl. ¶ 10.

On April 17, 2014, Plaintiff was examined during a follow up visit for his complaints of back pain. Espinoza Decl. ¶ 11. The April 16, 2014 MRI was cancelled due to Plaintiff's inability to lie still due to severe radicular pain down his left leg. *Id.* Plaintiff wondered if the MRI could

---

[11] Naproxen (brand names: Aleve, Naprosyn, and many others) is a nonsteroidal anti-inflammatory drug (NSAID) of the propionic acid class (the same class as ibuprofen) that relieves pain, fever, swelling, and stiffness. *See* https://en.wikipedia.org/wiki/Naproxen (last accessed July 24, 2017).

be rescheduled with sedation.  *Id.*  Plaintiff denied any red flag symptoms such as "weakness, saddle anesthesia[12] or incontinence."  *Id.* (footnote added).  He had difficulty cooperating with exam because of pain, but he had "normal gross strength."  *Id.*  Given the lack of any improvement, Plaintiff was admitted to the OHU because Defendant Espinoza was concerned that Plaintiff's "worsening mobility issue might create safety issues for him if he were to stay in his cell."  *Id.*  Plaintiff was opposed to moving to the OHU, but Defendant Espinoza reassured Plaintiff that his stay at the OHU was temporary until he was more ambulatory.  *Id.*  Defendant Espinoza discussed and signed Plaintiff out to the OHU provider, Dr. Cranshaw (a non-party), and made arrangements to reschedule the MRI with premedication.  *Id.*

On April 17, 2014, Plaintiff was examined by Dr. Cranshaw in the OHU for the exacerbation of Plaintiff's low back pain over the past few months.  Espinoza Decl. ¶¶ 12. Plaintiff was very upset that he had been admitted to the OHU that he refused to participate in any examination, to discuss his current symptoms/pain level, or to answer any questions asked by Dr. Cranshaw.  *Id.*

On April 23, 2014, Plaintiff's MRI showed degenerative changes of the lower lumbar spine which most severely affected the L4-L5 level with a large disc extrusion, spinal stenosis[13] effacement of the right lateral recess.  Espinoza Decl. ¶ 13 (footnote added).

### 2)  Left L4-L5 Surgery

On April 23, 2014, Plaintiff was referred for an outpatient neurosurgery consultation with Dr. Thomas Mampalam (a non-party) at Doctors Medical Center.  Espinoza Decl. ¶ 14.  Plaintiff subsequently underwent a "left L4-L5 surgery" on May 20, 2014.  *Id.*  Following discharge from Doctors Medical Center, Plaintiff returned to the OHU, where he received physical therapy and had gradual improvement.  *Id.*  Plaintiff was discharged from the OHU on July 16, 2014, and he

---

[12] Saddle anesthesia is a loss of sensation (anesthesia) restricted to the area of the buttocks, perineum and inner surfaces of the thighs.  *See* https://en.wikipedia.org/wiki/Saddle_anesthesia (last accessed Jun. 17, 2016).

[13] Spinal stenosis is an abnormal narrowing (stenosis) of the spinal canal that may occur in any of the regions of the spine.  This narrowing causes a restriction to the spinal canal, resulting in a neurological deficit.  Symptoms include pain, numbness, paraesthesia, and loss of motor control. *See* https://en.wikipedia.org/wiki/Spinal_stenosis (last accessed July 14, 2017).

was able to ambulate with a cane.  *Id.*  His pain was controlled with non-steroid anti-inflammatory medication.  *Id.*

On July 28, 2014, Defendant Espinoza examined Plaintiff for the first time since he had been discharged from the OHU.  Espinoza Decl. ¶ 15.  Plaintiff reported that his symptoms had improved, and that he was extremely grateful for the care provided to him (even though he was initially upset that Defendant Espinoza admitted him to the OHU).  *Id.*  Plaintiff did not complaint of any pain and was ambulating well.  *Id.*  Defendant Espinoza submitted a referral for Plaintiff to continue the physical therapy that he was previously getting in the OHU.  *Id.*

### 3)  Left Leg Pain and Foot Complaints

On September 15, 2014, Plaintiff had an appointment for a chronic care follow up regarding ongoing left foot numbness and swelling, which he claimed persisted for several months.  Espinoza Decl. ¶ 16.  Plaintiff was advised that there was not a specific treatment for numbness, but that numbness was a subtle defect that appears after urgent spine surgery.  *Id.*  Defendant Espinoza ordered Plaintiff T.E.D. hose[14] for swelling, and he noted that Plaintiff already had a previous ultrasound while in the OHU to evaluate this.  *Id.* (footnote added).

On October 30, 2014, Plaintiff had an appointment for a chronic care follow up.  Espinoza Decl. ¶ 17.  Plaintiff stated he had no complaints, and that he was "making progress."  *Id.*  He had no pain or mobility complaints.  *Id.*  Medical staff reviewed his blood pressure and labs.  *Id.*

On November 20, 2014, Plaintiff had an appointment for a chronic care follow up.  Espinoza Decl. ¶ 18.  Plaintiff complained of left groin/thigh pain and cramp/pain in left calf.  *Id.*  Plaintiff was ambulatory and displayed "good function."  *Id.*  His pain seemed most localized to left hip joint.  *Id.*  X-rays of the hip and back were ordered.  *Id.*

On December 4, 2014, Plaintiff was notified that the x-ray of his lumbar spine indicated that he suffered from arthritis.  Espinoza Decl. ¶ 19.

On December 7, 2014, Plaintiff was notified that the x-ray of his left hip was normal.

---

[14] T.E.D. hose is short for thromboembolism-deterrent hose, which is a type of compression stocking that supports the venous and lymphatic drainage of the leg.  *See* https://en.wikipedia.org/wiki/Compression_stockings#cite_note-24 (last accessed Jun. 19, 2017).

Espinoza Decl. ¶ 20.

On December 15, 2014, Plaintiff had an appointment for a chronic care follow up. Espinoza Decl. ¶ 21. Plaintiff complained of persistent groin pain and asked for neuropathic pain meds. *Id.* Plaintiff was ambulatory and functional as he was able to walk laps in the yard. *Id.* Plaintiff's mental health care provider, Dr. Williams (a non-party), was contacted about the propriety of combining medications. *Id.*

On March 12, 2015, Plaintiff had an appointment for a chronic care follow up. Espinoza Decl. ¶ 22. Plaintiff stated he was doing "pretty well." *Id.* He was wearing his left foot brace and appeared to be doing well as far as his functional status. *Id.* His neuropathic pain medication was increased. *Id.*

On June 4, 2014, Plaintiff had an appointment for a chronic care follow up. Espinoza Decl. ¶ 23. Plaintiff said his pain fluctuated. *Id.* Plaintiff was able to navigate stairs daily and walk across the yard. *Id.* Plaintiff was referred for further physical therapy. *Id.*

### 4) Right Leg Pain and DLT Classification Recommendation

On July 20, 2015, Plaintiff had an appointment for a chronic care follow up. Espinoza Decl. ¶ 24. Plaintiff stated he had new numbness in his right leg with occasional severe pain. *Id.* Plaintiff was concerned that although he had been referred to physical therapy, he had not yet been seen. *Id.* Plaintiff had refused to see his neurosurgeon for postoperative care but agreed to see a new neurosurgeon in the future. *Id.* An MRI of Plaintiff's spine was ordered for August 11, 2015. *Id.*

On August 17, 2015, Plaintiff was examined by Dr. Pachyniski (a non-party) for follow up after his recent MRI. Espinoza Decl. ¶ 25. Plaintiff requested crutches for his right lower leg pain, but it was denied because physical therapy staff stated he should continue with his cane instead of crutches. *Id.*

On September 8, 2015, Plaintiff had an appointment for a chronic care follow up. Espinoza Decl. ¶ 26. Plaintiff complained of increased symptoms in his right leg. *Id.* Physical therapy staff reported that Plaintiff had been belligerent and refused physical therapy. *Id.* Plaintiff requested special accommodations because he had right calf pain when walking to the dining hall.

*Id.* Defendant Espinoza recommended that Plaintiff be given a DLT classification in order for him to be transferred to a level terrain facility. *Id.* Plaintiff was very resistant to this and became quite angry. *Id.* Defendant Espinoza explained that because Doctors Medical Center has closed, Plaintiff would be referred to a new neurosurgeon, but that it was unlikely that such a referral would significantly improve his overall functioning or pain. *Id.* Plaintiff had refused to be examined by his prior neurosurgeon since his May 20, 2014 surgery. *Id.* Plaintiff stated he wanted to hold off on the DLT classification until he was able to consult the new neurosurgeon. *Id.* Plaintiff agreed to participate in physical therapy again and said he would not yell at physical therapy staff. *Id.* Plaintiff stated that Defendant Espinoza's suggestion of a transfer to a level terrain facility amounted to "retaliation" against him. *Id.* A request was submitted for a neurosurgical consultation. *Id.*

As explained above, on October 29, 2015, Plaintiff was examined by Dr. Wadhwa at UCSF for a neurosurgery consultation.[15] Espinoza Decl. ¶ 27.

On November 5, 2015, Plaintiff had an appointment for a chronic care follow up. Espinoza Decl. ¶ 28. Plaintiff asked for a lower bunk and stated that custody staff at the prison was trying to transfer him. *Id.* Defendant Espinoza again suggested that Plaintiff be given DLT classification because he had trouble climbing stairs. *Id.* Plaintiff was extremely resistant and appeared angry at this suggestion. *Id.* Defendant Espinoza explained that spine conditions were not part of the criteria needed to be granted a lower bunk accommodation and to be granted such an accommodation, he must be given a DLT classification. *Id.* Defendant Espinoza further explained that Plaintiff should be given such a classification for his own safety. *Id.* Plaintiff seemed to understand the reasons behind this decision and stated he hoped he would be transferred to a prison in Northern California. *Id.* During this visit, Plaintiff was designated as "ADA code DLT." *Id.* Defendant Espinoza noted that Plaintiff was likely going to be transferred to another institution imminently. *Id.* Since Plaintiff was to be transferred soon, medical staff discussed that

---

[15] For the sake of completeness, the Court repeats some of the factual background relating to Plaintiff's medical care discussed in the earlier section resolving Plaintiff's motion for a preliminary injunction.

he would follow-up with a new neurosurgeon at his transferring institution.  *Id.*

On December 1, 2015, Plaintiff had an appointment for a chronic care follow up.  Espinoza Decl. ¶ 29.  At that time a lab abnormality was discussed which he previously had as a side effect to a medication that was discontinued.  *Id.*  During that visit Plaintiff admitted to taking that medication surreptitiously even though it was not prescribed to him.  *Id.*  Plaintiff agreed to stop doing this.  *Id.*

On December 15, 2015, Plaintiff refused his chronic care clinic visit with Defendant Espinoza.  Espinoza Decl. ¶ 30.

### 5) Skin Lesions on Right Leg

On January 9, 2016, Plaintiff was admitted at TTA and examined because he was complaining of new skin lesions on his right leg.  Espinoza Decl. ¶ 31.  The lesions were unusual and TTA staff was concerned it could possibly be vasculitis.[16]  *Id.* (footnote added).  Plaintiff was referred to a telemedicine dermatology consultation, and he was also placed by a TTA provider on a "medical hold" pending the dermatologic evaluation.  *Id.*

On January 12, 2016, Plaintiff submitted a nursing Health Care Service Request Form asking why the MRI, CT scan and dynamic lumbar x-rays had not been ordered as suggested by Dr. Wadhwa.  Espinoza Decl. ¶ 32.

On January 14, 2016, Plaintiff had an appointment for a chronic care follow up.  *Id.*  Plaintiff expressed continued concern about the unusual skin lesions that had appeared three weeks prior.  Espinoza Decl. ¶ 33.  Dermatology recommendations were discussed.  *Id.*  Medical staff performed a biopsy that day, and prednisone was prescribed pursuant to dermatology recommendations.  *Id.*  Plaintiff inquired why the MRI, CT scan and dynamic lumbar x-rays had not been ordered as suggested by Dr. Wadhwa.  *Id.*  Defendant Espinoza explained that because Plaintiff would be transferred from SQSP to level terrain facility, Plaintiff would be referred to a new neurosurgeon.  *Id.*  Defendant Espinoza added that he would then defer to the new

---

[16] Vasculitis is a group of disorders that destroy blood vessels by inflammation.  See https://en.wikipedia.org/wiki/Vasculitis (last accessed July 2, 2017).

neurosurgeon, who would then decide if any further imaging was indicated. *Id.* Defendant

Espinoza noted that Plaintiff already had a recent MRI, and the need for a new MRI was

"unclear," especially considering that Plaintiff had significant difficulty tolerating MRIs even with

a high dose of premedication. *Id.* Defendant Espinoza further noted that Plaintiff's current

"medical hold" was for his dermatology issue. *Id.* Because Plaintiff could see the telemedicine

dermatologist remotely from any institution, Defendant Espinoza offered to take Plaintiff off the

"medical hold" in order for him to be transferred sooner to the level terrain facility and referred to

the new neurosurgeon. *Id.* Plaintiff stated that priority-wise he preferred to stay at SQSP until the

lesions were resolved. *Id.*

On January 28, 2016, Plaintiff had an appointment for a chronic care follow up. Espinoza

Decl. ¶ 34. Plaintiff stated that his lesions were getting bigger, and that he was not in any pain at

that time. *Id.* Defendant Espinoza discussed with Plaintiff that she was considering referring him

to a dermatologist at a local tertiary care center,[17] but was concerned this would further delay his

transfer to a level terrain facility. *Id.* (footnote added). Defendant Espinoza also reminded

Plaintiff that his neurosurgery follow up would take place after his transfer to a level terrain

facility. *Id.* Plaintiff again requested to extend the "medical hold" until his lesions were

significantly improved. *Id.* Plaintiff indicated that he was agreeable with delaying his

neurosurgery follow-up referral due to his "medical hold." *Id.* Plaintiff stated his pain and

mobility issues have improved in the last four to five weeks, and that they were not pressing issues

for him anymore. *Id.* Plaintiff was referred to see a dermatologist urgently at a local tertiary care

center. *Id.*

On May 2, 2016, Plaintiff was scheduled for a chronic care follow up, but he refused to be

examined by Defendant Espinoza during that appointment. Espinoza Decl. ¶ 35. In the meantime,

Plaintiff was being treated for his right lower extremity lesions by the dermatologist, and he was

---

[17] A tertiary referral hospital (also called or tertiary care center) is a hospital that provides tertiary care, which is health care from specialists in a large hospital after referral from primary care and secondary care. *See* https://en.wikipedia.org/wiki/Tertiary_referral_hospital (last accessed May 27, 2017).

also receiving treatment for his wound at a specialized offsite wound clinic. *Id.*

On May 3, 2016, Defendant Espinoza discussed Plaintiff's lesions with Dr. Mohebali (a non-party) at Kentfield Wound Card, and Dr. Mohebali recommended to start Plaintiff on antibiotics. Espinoza Decl. ¶ 36. Defendant Espinoza made arrangements to meet with Plaintiff at her clinic to discuss Dr. Mohebali's recommendation. *Id.* However, Plaintiff refused to be seen and abruptly left the room. *Id.* Later, Plaintiff agreed to speak with Defendant Espinoza, but stated he was upset because he was not given narcotics for his right leg ulcers. *Id.* Plaintiff further stated he did not want to be seen in clinic because he did not want to discuss his pending transfer to a level terrain facility or his DLT designation. *Id.* Plaintiff was encouraged to attend any scheduled primary care appointments so that his concerns could be addressed. *Id.* Given Plaintiff's hostility during past medical appointments, medical staff determined that custody staff should be nearby during any future appointments. *Id.*

As of July 2016, Plaintiff was being seen at Kentfield Wound Care and UCSF dermatology where he was getting care for his chronic leg ulcers, which had slowly improved. Espinoza Decl. ¶ 37. Plaintiff also reported that his back pain and symptoms continued to improve significantly. *Id.* Plaintiff continued to refuse repeatedly to be seen by Defendant Espinoza. *Id.* Despite this, Defendant Espinoza regularly communicated with specialists and coordinated Plaintiff's care with Kentfield Wound Care and the UCSF providers. *Id.* Finally, as explained above, Defendant Espinoza claims that "became clear that the right leg pain and symptoms which prompted his referral to the second neurosurgeon, Dr. Wadhwa, were in fact due to his skin condition (his lesion showed up shortly thereafter) and not his spine." *Id.*

## B. Legal Standard

Summary judgment is proper where the pleadings, discovery and affidavits demonstrate that there is "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Material facts are those which may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Id.*

The party moving for summary judgment bears the initial burden of identifying those portions of the pleadings, discovery, and affidavits which demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the moving party will have the burden of proof on an issue at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. On an issue for which the opposing party by contrast will have the burden of proof at trial, as is the case here, the moving party need only point out "that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

Once the moving party meets its initial burden, the nonmoving party must go beyond the pleadings and, by its own affidavits or discovery, "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The court is only concerned with disputes over material facts and "[f]actual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248. It is not the task of the court to scour the record in search of a genuine issue of triable fact. *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996). The nonmoving party has the burden of identifying, with reasonable particularity, the evidence that precludes summary judgment. *Id.* If the nonmoving party fails to make this showing, "the moving party is entitled to a judgment as a matter of law." *Celotex*, 477 U.S. at 323.

For purposes of summary judgment, the court must view the evidence in the light most favorable to the nonmoving party; if the evidence produced by the moving party conflicts with evidence produced by the nonmoving party, the court must assume the truth of the evidence submitted by the nonmoving party. *See Leslie v. Grupo ICA*, 198 F.3d 1152, 1158 (9th Cir. 1999).

A district court may only consider admissible evidence in ruling on a motion for summary judgment. *See* Fed. R. Civ. P. 56(e); *Orr v. Bank of America*, 285 F.3d 764, 773 (9th Cir. 2002). In support of the motion for summary judgment, Defendants Reyes and Espinoza have presented their own declarations. Dkts. 30-2, 30-3. Meanwhile, Plaintiff has filed his verified complaint and opposition. Dkts. 1, 33. The Court construes his complaint as an affidavit under Federal Rule of Civil Procedure 56, insofar as it is based on personal knowledge and sets forth specific facts admissible in evidence. *See Schroeder v. McDonald*, 55 F.3d 454, 460 & nn.10-11 (9th Cir. 1995).

### C. Discussion

#### 1. Deliberate Indifference to Medical Needs Claim

The Eighth Amendment protects prisoners from inhumane conditions of confinement. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). The government has an "obligation to provide medical care for those whom it is punishing by incarceration," and failure to meet that obligation can constitute an Eighth Amendment violation cognizable under section 1983. *Estelle v. Gamble*, 429 U.S. 97, 103-105 (1976).

In order to prevail on an Eighth Amendment claim for inadequate medical care, a plaintiff must show "deliberate indifference" to his "serious medical needs." *Estelle*, 429 U.S. at 104. "This includes 'both an objective standard—that the deprivation was serious enough to constitute cruel and unusual punishment—and a subjective standard—deliberate indifference.'" *Colwell v. Bannister*, 763 F.3d 1060, 1066 (9th Cir. 2014) (citation omitted).

To meet the objective element of the standard, a plaintiff must demonstrate the existence of a serious medical need. *Estelle*, 429 U.S. at 104. A "serious medical need[]" exists if the failure to treat a prisoner's condition could result in further significant injury or the "[u]nnecessary and wanton infliction of pain." *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992) (citing *Estelle*, 429 U.S. at 104), *overruled in part on other grounds by WMX Techs., Inc. v. Miller*, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc). The existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain are examples of indications that a prisoner has a "serious" need for medical treatment. *McGuckin*, 974 F.2d at 1059-60 (citing *Wood v. Housewright*, 900 F.2d 1332, 1337-41 (9th Cir. 1990)).

To satisfy the subjective element, the plaintiff must show that "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. A plaintiff must establish that the course of treatment the doctors chose was "medically unacceptable under the circumstances" and that they

embarked on this course in "conscious disregard of an excessive risk to [the plaintiff's] health." *See Toguchi v. Chung*, 391 F.3d 1051, 1058-60 (9th Cir. 2004) (citing *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996)). A claim of mere negligence related to medical problems, or a difference of opinion between a prisoner patient and a medical doctor, is not enough to make out a violation of the Eighth Amendment. *Id.*

Here, Plaintiff claims that Defendants were deliberately indifferent to his medical needs when they denied him adequate treatment for his low back pain beginning when he was first arrived at SQSP on December 8, 2009. Dkt. 1 at 4-6. Specifically, Plaintiff claims that his low back pain condition "exacerbated because of [Defendant Reyes's] negligence" while he was under her care for the first two years he was at SQSP. *Id.* at 6. Plaintiff claims that he was under the care of "[Defendant] Espinoza and other doctor[]s in 2014," and that the "medical care they provided [for his] back issues amounted to no medical care at all." *Id.* at 7. Finally, Plaintiff claims that on May 20, 2014, he had "urgent emergency back surgery by Dr. T. Mampalan." *Id.* at 8. Even after his surgery, Plaintiff claims that he was "going through the same issue[]s with medical as [he] did prior to [his] back surgery." *Id.* at 8-9. Plaintiff claims that Defendant Espinoza failed to refer him to "a different neurosurgeon for a second opinion, and instead, she "interjects the threat[] of transfer" each time Plaintiff inquired about the referral. *Id.* at 9. Finally, Plaintiff claims that Defendant Tootell, as the CMO of the prison failed to "assert her authority to approve or arrange any accommodations in a timely fashion." *Id.* at 10. Plaintiff adds in his opposition that Defendant Tootell also "ha[d] the authority to approve outside specialist visits." Dkt. 33 at 21.

While Defendants seem to concede that, as alleged, Plaintiff's health condition may rise to the level of a serious medical need, they argue that no evidence exists to show that Defendants acted with "deliberate indifference" to that need. Dkt. 30 at 13-16. Defendants also argue that Defendants Reyes's and Espinoza's treatment of Plaintiff's back pain was within the standard of medical care and thus they did not deny Plaintiff any appropriate or reasonable medical treatment. *Id.* at 16. Specifically, Defendants claim that Defendants Reyes and Espinoza are "familiar with the CDCR's standard of medical care and with the level of skill, knowledge and care in the

diagnosis and treatment that other reasonably careful physicians would use in the same or similar circumstances presented by plaintiff's lawsuit." *Id.* (citing Reyes Decl. ¶ 16; Espinoza Decl. ¶ 39). Defendants further argue that "[g]iven Plaintiff's complaints, clinical presentation and diagnostic evaluations, the medical care of his chronic back pain was at all times proper and appropriate." *Id.* (citing Reyes Decl. ¶ 17; Espinoza Decl. ¶ 40). Defendants claim that the medical care given to Plaintiff by Defendants Reyes and Espinoza was "within the CDCR's standard of medical care and was consistent with the level of skill, knowledge and care in the diagnosis and treatment that other reasonably careful physicians would use in the same or similar circumstances as complained of by Plaintiff." *Id.* Defendants claim that neither Defendant Reyes nor Defendant Espinoza denied Plaintiff any appropriate or reasonable medical treatment. *Id.* Finally, as mentioned above, Defendants argue that "at no time relevant to plaintiff's lawsuit did [Defendant] Tootell in any way diagnose or treat plaintiff." *Id.*

As mentioned above, a prison official is deliberately indifferent if he or she knows that a prisoner faces a substantial risk of serious harm and disregards that risk by failing to take reasonable steps to abate it. *Farmer*, 511 U.S. at 837. In order to establish deliberate indifference, a plaintiff must show a purposeful act or failure to act on the part of the defendant and a resulting harm. *McGuckin*, 974 F.2d at 1060. Such indifference may appear when prison officials deny, delay, or intentionally interfere with medical treatment, or it may be shown in the way in which prison officials provided medical care. *See id.* at 1062.

To the extent that Plaintiff's claim amounts to medical malpractice or an allegation that Defendants were negligent in providing treatment, his allegations do not support an Eighth Amendment claim. *See Franklin v. State of Or., State Welfare Div.*, 662 F.2d 1337, 1344 (9th Cir. 1981); *Toguchi*, 391 F.3d at 1060; *McGuckin*, 974 F.2d at 1059 (mere negligence in diagnosing or treating a medical condition, without more, does not violate a prisoner's Eighth Amendment rights); *O'Loughlin v. Doe*, 920 F.2d 614, 617 (9th Cir. 1990) (repeatedly failing to satisfy requests for aspirins and antacids to alleviate headaches, nausea, and pains is not constitutional violation; isolated occurrences of neglect may constitute grounds for medical malpractice but do not rise to level of unnecessary and wanton infliction of pain). Despite Plaintiff's claims that he

received no treatment for his low back pain, Defendants Reyes and Espinoza have submitted verified declarations indicating that Plaintiff's conditions and complaints were treated continuously based upon the medical evidence as well as the judgment of the medical providers. *See* Reyes Decl. ¶¶ 4-14; Espinoza Decl. ¶¶ 4-37.  As explained in detail above, the evidence shows that from 2010 to 2014, each time Plaintiff presented with any low back pain, he was evaluated, treated with medication, and at some point x-rays and MRIs were ordered as needed. From April 10, 2014 to May 20, 2014, Plaintiff was moved to the OHU (where an MRI was ordered), referred for an urgent outpatient neurosurgeon consultation at Doctors Medical Center, and then underwent L4-L5 surgery.  Following his discharge from Doctors Medical Center, Plaintiff returned to the OHU where he received physical therapy and displayed gradual improvements.  Plaintiff was discharged from the OHU on July 16, 2014, and he was able to walk with a cane.  Defendant Espinosa and SQSP medical staff controlled Plaintiff's pain with non-steroid anti-inflammatory medication.  Over the next year, Plaintiff had follow up appointments approximately once a month.  At these visits, Plaintiff was ambulatory and "functional."  Follow up x-rays and an MRI were ordered when indicated.  In 2015, Plaintiff experienced other ailments, including pain in his right leg and thigh, which developed into skin lesions.  Medical staff examined Plaintiff on multiple occasions and provided treatment for these new ailments.  During this time, Plaintiff was informed that Doctors Medical Center had closed, and he would have to be referred to a new neurosurgeon.  Plaintiff was examined by the new neurosurgeon, Dr. Wadhwa from UCSF on October 29, 2015.  From September 2015 through July 2016, Plaintiff focused on his new ailments (specifically the skin lesions on his right leg), and he had approximately ten additional clinic visits.  Because Plaintiff had increased pain to his right leg, medical staff suggested that Plaintiff would have to be given a DLT classification in order to be transferred to a level terrain facility.  However, Plaintiff, who had a "medical hold" based on his dermatology issue, preferred to remain at SQSP under after his lesions were resolved.  Plaintiff also agreed to continue the "medical hold" and delay his neurosurgery follow up because his pain and mobility issues had improved.  As of July 2016, Plaintiff was receiving treatment for his skin lesions from Kentfield Wound Care and UCSF dermatology, and his conditions slowly improved.  Plaintiff also

23

reported that his back pain and related symptoms continued to improve significantly.[18]

In sum, the undisputed evidence (supported by Defendants Reyes's and Espinoza's declarations) shows no evidence to suggest that any of Plaintiff's requests for medical treatment were ignored and could have resulted in further injury. Even if Plaintiff claims he should have received different treatment for his medical needs, a difference of opinion as to the urgency and treatment of his medical needs is insufficient, as a matter of law, to establish deliberate indifference. *See Toguchi*, 391 F.3d at 1058, 1059-60; *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989). In order to prevail on a claim involving choices between alternative courses of treatment, a plaintiff must show that the course of treatment the doctors chose was medically unacceptable under the circumstances and that they chose this course in conscious disregard of an excessive risk to plaintiff's health. *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir.1996) (citing *Farmer*, 511 U.S. at 837). The evidence here establishes that Defendants Reyes and Espinoza chose a course of treatments that was medically accepted. Although the medical treatment Plaintiff received may not have been what he considered proper treatment, he presents no evidence that Defendants Reyes and Espinoza were deliberately indifferent to his serious medical needs. Rather, the undisputed factual record shows that they: (1) continuously monitored and treated Plaintiff, specifically for his complaints of low back pain; (2) modified his prescribed medications and made referrals to consultants when needed; (3) chose medically acceptable courses of treatment while being aware of the risks associated with his health problems (i.e., low back pain, leg pain, hip pain, and skin lesions); (4) provided prescription drugs and ordered x-rays and MRIs when needed; (5) referred Plaintiff for an urgent outpatient neurosurgery consultation which led to his L4-L5 surgery; and (6) continued follow up care afterwards until his low back pain symptoms improved. Thus, Plaintiff has failed to provide evidence regarding an essential element of his Eighth Amendment claim against Defendants Reyes and Espinoza.

Accordingly, Plaintiff's Eighth Amendment claim fails as a matter of law. Therefore, the

---

[18] In his opposition, Plaintiff claims that he still currently "ha[s] pain and burning in his left foot," but nowhere does he claim to have any lower back pain—which is the medical problem at issue in this lawsuit. *See* Dkt. 33 at 14.

1   court GRANTS Defendants' motion for summary judgment as to Plaintiff's claim that Defendants

2   Reyes and Espinoza were deliberately indifferent to his medical needs.

3                      **2.  Supervisory Liability Claim Against Defendant Tootell**

4           While Plaintiff alleges that his Eighth Amendment rights were violated when Defendants

5   Reyes and Espinoza were allegedly deliberately indifferent to his serious medical needs, the Court

6   notes that Plaintiff has failed to link Defendant Tootell to this Eighth Amendment claim.  For

7   example, as explained above, Plaintiff alleges that Defendant Tootell as the CMO of the prison

8   failed to "assert her authority to approve or arrange any accommodations in a timely fashion."

9   Dkt. 1 at 10.  Plaintiff also alleges that Defendant Tootell "has the authority to approve outside

10  specialist visits."  Dkt. 33 at 21.  Thus, without more, it seems that such allegations do not

11  establish the requisite level of personal involvement.

12          The Court construes Plaintiff's claim against Defendant Tootell as a supervisory liability

13  claim.  However, Plaintiff only makes conclusory allegations that Defendant Tootell failed to use

14  her "authority" to arrange accommodations or approve outside specialist visits.  *See id.*

15  Conclusions masquerading as facts are insufficient to hold Defendant Tootell accountable.  *See*

16  *Marks v. United States*, 578 F.2d 261, 263 (9th Cir.1978) ("Conclusory allegations unsupported by

17  factual data will not create a triable issue of fact.") (citation omitted).  Furthermore, defendants

18  whose personal involvement is not alleged cannot be held liable for the acts of their subordinates

19  under a theory of respondeat superior or vicarious liability.  *See Milton v. Nelson*, 527 F.2d 1158,

20  1159 (9th Cir. 1975).  Vicarious liability on the part of a supervisory official is not recognized as a

21  basis for liability under the Civil Rights Act.  *Palmer v. Sanderson*, 9 F.3d 1433, 1438 (9th Cir.

22  1993). A supervisor is liable only when he or she has directly participated in or proximately

23  caused the alleged deprivation.  *Id.* at 1437-38; *see also Harris v. City of Roseburg*, 664 F.2d

24  1121, 1125 (9th Cir. 1981); *May v. Enomoto*, 633 F.2d 164, 167 (9th Cir. 1980).  The law is clear

25  that liability of supervisory personnel must be based on more than merely the right to control

26  others.  *Monell v. Department of Social Services*, 436 U.S. 658, 694 n.58 (1978).

27          Here, Plaintiff has not made a causal link between Defendant Tootell and a violation of his

28  constitutional rights.  To the extent Defendant Tootell is being sued in her capacity as a

supervisory official, Plaintiff fails to raise a material issue of fact against this Defendant because nothing in the record shows that she directly participated in or proximately caused the alleged deprivation. In any event, the Court has found above that Plaintiff's Eighth Amendment claim against Defendant Tootell's subordinates—Defendants Reyes and Espinoza—has failed as a matter of law. Accordingly, Defendants' motion for summary judgment is GRANTED as to Plaintiff's supervisory liability claim against Defendant Tootell.

## IV. CONCLUSION

For the reasons outlined above, the Court rules as follows:

1. Plaintiff's request for a preliminary injunction is DENIED. Dkt. 28.

2. Defendants' motion for summary judgment is GRANTED, and judgment will be entered in their favor. Dkt. 30.

3. The Clerk of the Court shall terminate all pending motions and close the file.

4. This Order terminates Docket Nos. 28 and 30.

IT IS SO ORDERED.

Dated: August 31, 2017

YVONNE GONZALEZ ROGERS
United States District Judge